UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GINA STUCKI; MINOR CHILD 1, by and through her mother GINA STUCKI; and MINOR CHILD 2, by and through her mother, GINA STUCKI,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF POCATELLO; BANNOCK COUNTY SHERIFF'S OFFICE; BANNOCK COUNTY EMERGENCY COMMUNICATIONS CENTER and NIKO GORDON IV, individually and in his official capacity as a police officer for Pocatello Police Department,<br><br>Defendants. | Case No. 4:15-cv-00422<br><br>MEMORANDUM DECISION AND ORDER |

# INTRODUCTION

The Court has before it Defendants City of Pocatello and Niko Gordon's Motion for Summary Judgment (Dkt. 51). The Court heard oral argument on the motion on May 17, 2017 and now issues the following decision.

# FACTUAL BACKGROUND.

In May 2012, Jay Romjue and Gina Stucki were romantically involved, and Romjue moved into Stucki's house. He later moved out, but on September 11, 2013, Stucki called police regarding concerns about Romjue. Stucki made the call directly to

police headquarters; it was not a 911 call. Stucki asked the police to help her get Romjue to leave her alone.

That evening, Officer Evans met with Stucki. He told her he would contact Romjue the next morning and tell him to leave Stucki alone or face trespassing charges. At about 8:00 a.m. the next morning, police received a hang-up 911 call from the Stucki residence. Romjue had entered Stucki's home, grabbed Stucki by the hair, and was waiving a gun. Stucki's daughter made the 911 hang-up call.

Dispatch advised Officer Gordon of the 911 hang-up call. Officer Gordon went to the Stucki residence, and Stucki answered the door. Officer Gordon asked her if everything was okay. Stucki shook her head no, and pulled Officer Gordon into the house. Officer Gordon did not see any signs of struggle at that moment, but Stucki and her daughter were crying. Officer Gordon was positioned between the child and Romjue, but at some point Stucki and her child ended up behind Romjue.

Officer Gordon began questioning Romjue. He then suggested Romjue leave the residence so the parties could cool off. Stucki informed Officer Gordon that she and Romjue had a past relationship which had been physically abusive at times. Both Stucki and Romjue confirmed that there had been pushing. About five minutes into the encounter, Stucki's daughter told Officer Gordon that Romjue had a gun. Officer Gordon asked to see the gun, and Romjue pulled it out. Romjue did not place his finger on the trigger, and he appeared to be surrendering his gun. Romjue did not appear agitated, but seemed calm and compliant.

Officer Gordon started to step back, but slipped and fell. As he fell, he pulled out his gun, tried to radio for back up, and fired four shots at Romjue. None of the shots hit Romjue. Stucki grabbed her daughter and ran to the bathroom. Romjue headed the opposite way to the kitchen. Officer Gordon abandoned his position between Stucki and Romjue and left the house. Officer Gordon then called dispatch, advised that shots had been fired, and was told by dispatch to retreat and take cover. Officer Gordon then left the immediate area.

Stucki and her daughter were left in the house with Romjue for about 45 minutes. Outside, police advised Stucki and her children to stay calm. Romjue eventually broke through the bathroom door. He then killed himself in front of Stucki and her children. Stucki filed this action on behalf of herself and two daughters alleging federal civil rights claims and state negligence claims.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed.R.Civ.P. 56(e). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

## ANALYSIS

1. **Federal Due Process Claims**

Generally, the public has no constitutional right to sue state employees who fail to protect them against harm inflicted by a third party. *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (*citing DeShaney v. Winnebago County, Dep't of Social Servs.*, 489 U.S. 189, 197 (1989). There are two exceptions to this rule: "(1) the 'special relationship' exception; and (2) the 'danger creation' exception." *Id.*

   A. **Special Relationship**

The special relationship exception is typically created when the State takes someone into its custody and holds them against their will. *Campbell v. State of Washington Dept. of Social And Health Services*, 671 F.3d 837, 842 (9th Cir. 2011) (*citing DeShaney*, 489 U.S. at 199-200. "[I]t is the State's affirmative act of restraining

the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraint of personal liberty – which is the 'deprivation of liberty' triggering the protections of the Due Process Clause. . . ." *Id.,* (*quoting DeShaney*, 489 U.S. at 200). In these circumstances, the State must assume responsibility for the individual's safety because the State made it impossible for the individual to care for herself. *Id.* (*citing DeShaney*, 489 U.S. at 200). The duty does not arise from the State's knowledge of an individual's troubles or even from the State's expression of intent to help; it comes from the "limitation the state has imposed on the person's freedom to act for himself." *Id.* (*citing DeShaney*, 489 U.S. at 200). A State may impose affirmative duties of care and protection upon its agents, "[b]ut not all common-law duties owed by government actors were . . . constitutionalized by the Fourteenth Amendment." *DeShaney*, 498 U.S. at 202 (Internal citation omitted).

Here, no special relationship was created. Neither Officer Evans nor Officer Gordon restricted the Stucki family's ability to act for themselves. They were not taken into custody, incarcerated, or otherwise restrained. They were not held against their will by the police. Accordingly, the "special relationship" exception does not apply

B. **Danger Creation**

The danger creation exception applies when the "state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Johnson v. City of Seattle*, 474 F.3d 634, 639-40 (9th Cir. 2007) (Internal citation omitted). A police officer's conduct which affirmatively places someone in a position of danger deprives

that person of a substantive due process right. *Id.* (Internal citation omitted). For example, in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), the Ninth Circuit reversed summary judgment in favor of an officer where the record contained evidence that the officer arrested the driver of a vehicle for drunk driving, ordered the plaintiff, a female passenger, out of the vehicle, and had the vehicle impounded. The officer then left the female plaintiff stranded in an area with a high violent crime rate. She accepted a ride from a stranger because her home was five miles away, and the stranger took her to a secluded area and raped her. *Johnson,* 474 F.3d at 639-40 (*citing Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989)).

Here, taking the facts in the light most favorable to plaintiffs, Officer Gordon created or exposed plaintiffs to a danger they would not have faced but for his actions. There is evidence that Romjue was compliant and willing to turn over his gun until Officer Gordon fired four shots at him. After that, Romjue held Stucki and her children hostage with the gun, and eventually killed himself in front of them. Accordingly, the danger creation exception applies.

However, there is no constitutional claim unless defendants' conduct placed plaintiffs in peril in deliberate indifference to their safety. *Penilla v. city of Huntington Park,* 115 F.3d 707, 709 (9th Cir. 1997). For a municipality, the deliberate indifference standard must be based upon a policy causing lack of training for the officer. *Wood,* 879 F.3d at 588. Here, there is no evidence of deliberate indifference on either front. Although possibly careless or negligent, Officer Gordon's response to seeing Romjue's

gun was not deliberately indifferent – he discharged his weapon as he fell in response to seeing Romjue's weapon. And there is no evidence that the city had a policy causing a lack of training for Officer Gordon. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (Internal citation omitted).

Stucki hired an "expert" who attempts to articulate what the deliberate indifference standard would be under the facts of this case, and then offer the opinion that defendants failed to live up to that standard. But that is not how deliberate indifference is proven. Deliberate indifference is a legal standard as described above, and the facts of the case must be applied to that standard. Here, as explained by the City of Pocatello's Chief of Police, the city tries to send two officers to a 911 hang-up call, but that is not always possible and it is left in the discretion of the officer. *Marchand Depo.,* pp. 30-32, Dkt. 63-2. That is what happened here, and it does not amount to deliberate indifference. Any "policy" or "standard" suggested by Stucki's expert is not relevant. Accordingly, there is no evidence of deliberate indifference on the part of either Officer Gordon or the City, and the federal due process claims will be dismissed.

2.   **State Law Claims**

Plaintiffs also allege state law claims for negligence/recklessness. In Idaho, "[o]rdinarily, there is no affirmative duty to act to assist or protect another absent unusual circumstances, which justifies imposing such an affirmative responsibility." *Rees v State, Dept. of Health and Welfare,* 137 P.3d 397, 402 (Idaho 2006) (Internal quotation and

citation omitted). "An affirmative duty to aid or protect arises only when a special relationship exists between the parties." *Coghlan v. beta Theta Pi Fraternity,* 987 P.2d 300, 311 (Idaho 1999) (Citing Restatement (Second) of Torts § 314A (1965). But "if one voluntarily undertakes to perform an act, having no prior duty to do so, the duty arises to perform the act in a non-negligent manner." *Id.* at 312 (Internal quotation and citation omitted).

The test for determining whether a "special relationship" exists under Idaho law is somewhat different from the federal law discussed above. But the result is the same here – there is no special relationship. The Idaho Supreme Court has explained that "having control over someone or a duty to protect that person is indicative of a special relationship." *Beers v. Corporation of President of Church of Jesus Christ of Latter-Day-Saints,* 316 P.3d 92, 98 (Idaho 2013). The court gave examples such as "a parent's duty to control his child, an employer's duty to control an employee while at work, or a law enforcement officer's duty to control a dangerous prisoner." *Id.,* (Internal quotation and citation omitted). The important and common element to these relationships is that each has "knowledge of an unreasonable risk of harm and the right and ability to control the third party's conduct." *Id*. "[A] special relationship imposing a duty to control another's conduct requires a foreseeable risk and the right and ability to control that person's conduct." *Id.* Determining whether a special relationship exists "requires an evaluation of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection." *Id.*

At first blush, one might think that Officer Gordon fits the example of an officer's duty to control a dangerous prisoner. But first looks and initial assumptions can be deceiving. Officer Gordon responded to a 911 hang-up call, where he soon learned about a domestic dispute. However, Romjue was not a dangerous prisoner in the custody of Officer Gordon. Officer Gordon had no knowledge of an unreasonable risk of harm before he encountered Romjue. Thus, considering the policy behind Idaho's law, the Court does not find a special relationship. The same finding applies to the police department to the extent there is a question of a special relationship with the entire department.

But nothing in Idaho case law or statutory law suggests a police officer is not subject to the same duty of non-negligence as a private citizen when he undertakes to perform an act. In fact, Idaho Code § 6-903 specifically states that "every governmental entity is subject to liability for money damages arising out of its negligent or otherwise wrongful acts or omissions and those of its employees acting within the course and scope of their employment or duties . . . where the governmental entity if a private person or entity would be liable for money damages under the laws of the state of Idaho." I.C. § 6-903. And the ITCA provides "relief to those suffering injury from the negligence of government employees." *Id.* at 405 (Citing *Sterling v. Bloom,* 723 P.2d 755, 758 (Idaho 1986). "The ITCA is to be construed liberally, consistent with its purpose, and with a view to attaining substantial justice. *Id*. (Internal citation omitted). Liability is the rule, and immunity is the exception under the ITCA. *Id.*

Defendants cite Justice Huntley's concurring opinion in *Jones v City of St. Maries,* 727 P.2d 1161 (Idaho 1986) for the statement that "where the government undertakes to warn the public of danger and thereby induces reliance [it] must perform [its] 'good Samaritan' task in a careful manner, just as a private individual under like circumstances would be obligated." *Jones,* 727 P.2d at 1168 (Internal quotation and citation omitted). Defendants then suggest this requires a special relationship. But that is not what Justice Huntley is saying. He is reiterating the rule that when a government employee acts as a good Samaritan, he must act in a careful manner. This is in line with Idaho case law that anyone who voluntarily undertakes to perform an act, having no prior duty to do so, must act in a non-negligent manner." *Coghlan,* 987 P.2d at 311. This language supports a finding that a government employee, such as a police officer, is held to the same standard as a private citizen when he undertakes to perform an act. So like a private citizen, the police officer must act in a non-negligent manner.

Here, there is evidence that Officer Gordon undertook an act to address or diffuse the domestic dispute at the Stucki residence. When taken in the light most favorable to plaintiffs, there is evidence that he did so in a negligent manner when he fired his weapon four times as he was falling, and then fled the residence. Accordingly, the Court will deny

the motion for summary judgment on the state law negligence claims against Officer Gordon.[1]

Regarding the City of Pocatello, under the doctrine of respondeat superior, an employer is liable for the tortious conduct of an employee committed within the scope of employment. *Teurlings v. Larson,* 320 P.3d 1224, 1233 (Idaho 2013). "The scope of one's employment includes conduct (1) which is the kind the employee is employed to perform, that (2) occurs substantially within the authorized limits of time and space, and (3) is actuated, at least in part, by a purpose to serve the master." *Id.* (Internal quotations and citations omitted). Here, Officer Gordon was on duty and acting as an officer of the City of Pocatello Police Department when he committed the alleged negligent actions. Accordingly, the negligence claims against the City of Pocatello may proceed as well.

## ORDER

**IT IS ORDERED:**

1. Defendants City of Pocatello and Niko Gordon's Motion for Summary Judgment (Dkt. 51) is **GRANTED in part** and **DENIED in part**. It is granted

---

[1] The amended complaint, briefing and oral argument were not altogether clear on the state law negligence claims against Officer Evans and Ms. Spackman. But to the degree Plaintiffs intend to pursue claims against them, the Court will grant summary judgment in the defendants' favor. There is simply no evidence that either of them acted negligently. Officer Evans responded to a call from Stucki, and agreed to contact Romjue the next morning. The events that triggered this lawsuit happened early the next morning, and it was not negligent for Officer Evans to not have contacted Romjue by that time. Regarding Ms. Spackman, the assertion that she did not follow proper protocol in sending two officers to the Stucki residence is simply a misstatement of the city's protocol.

as to the federal claims and denied as to the state law claims. The negligence claims against Officer Gordon and the City of Pocatello may proceed.

2. Defendants City of Pocatello's and Niko Gordon's Motion to Strike Declaration of Gina Stucki (Dkt. 63) is **DEEMED MOOT** because it did not affect the Court's decision of the motion for summary judgment.

3. Plaintiff's Motion to Correct, Cure or Supplement Gina Stucki's and Expert Layman's Declarations Submitted in Response to Defendants' Motion for Summary Judgment and, Alternatively, Extend Time to Submit (Dkt. 64) is **GRANTED** to the extent explained by the Court at oral argument.

DATED: August 25, 2017

B. Lynn Winmill
Chief Judge
United States District Court